**SAXENA WHITE P.A.**
David R. Kaplan (SBN 230144)
dkaplan@saxenawhite.com
12750 High Bluff Drive, Suite 475
San Diego, CA 92130
Telephone: (858) 997-0860
Facsimile: (858) 369-0096

*Counsel for Plaintiff*
*Plymouth County Retirement Association*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PLYMOUTH COUNTY RETIREMENT ASSOCIATION, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>UPSTART HOLDINGS, INC., DAVID J. GIROUARD, and SANJAY DATTA,<br><br>Defendants. | Case No.:<br><br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Plymouth County Retirement Association ("Plaintiff"), by and through its attorneys, alleges the following upon information and belief, except as to allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, among other things, its counsel's investigation, which includes, without limitation: (a) review and analysis of public filings made by Upstart Holdings, Inc. ("Upstart" or the "Company") with the U.S. Securities and Exchange Commission (the "SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants (defined below) and other parties; (c) review of news articles, shareholder communications, conference calls, and postings on Upstart's website concerning the Company's public statements; and (d) review of other publicly available information concerning the Company and the Individual Defendants.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all persons or entities who purchased Upstart securities between March 18, 2021 and May 9, 2022, inclusive (the "Class Period") against Upstart and certain of its officers (collectively "Defendants") seeking to pursue remedies under the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq*. (the "Exchange Act").

2.      Upstart is a financial technology firm that uses artificial intelligence ("AI") and data science to underwrite consumer credit. The Company partners with banks to offer credit to consumers, either through the Upstart website or through banking partner websites embedded with Upstart technology. Upstart claims that its underwriting process allows banking partners to originate credit with higher approval rates, lower loss rates, and a high degree of automation.

3.      Throughout the Class Period, Defendants claimed that the lack of loans the Company retained on its balance sheet ensured it only was exposed to limited credit risk. In reality, as investors learned after markets closed on May 9, 2022, the Company's highly touted, AI underwriting model was unable to adequately assess credit risk in changing macroeconomic conditions. As a result, Upstart had been increasingly underwriting progressively less creditworthy loans throughout the Class Period.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1

4.      Investors learned the truth during the Company's first quarter 2022 earnings call with analysts when Upstart admitted that the loans the Company had been forced to retain on its balance sheet had *more than doubled in a single quarter*.  Specifically, Chief Financial Officer ("CFO") Sanjay Datta reported that the "balance of loans, notes, and residuals at the end of the quarter was . . . up to $604 million from $261 million in Q4."  CFO Datta attributed the increase of loans on the Company's balance sheet to "rising interest rates and rising consumer delinquencies putting downward pressure on conversion."  CFO Datta acknowledged that "historically, [the Company's] balance sheet has been almost exclusively for the purposes of R&D," but in the first quarter of 2022, the Company used the balance "to do . . . sort of a market clearing mechanism."  He further stated that Upstart had "started to selectively use [its] capital as a funding buffer for core personal loans in periods of interest rate fluctuation where the market clearing price is in flux."

5.      Reporting on the Company's results, one analyst dismissed the Company's purported "market clearing" justification and explained that the increase in loans on the Company's balance sheet represented a "divergence" from the Company's "capital-light business model" that indicated the Company had "few alternatives other than to hold more loans due to funding issues."  In response to this disclosure, the price of Upstart common stock cratered 56% the following trading day, from a closing price of $77.13 on May 9, 2022, to a closing price of $33.61 on May 10, 2022.

6.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities when the truth was disclosed, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act (15 U.S.C. § 78aa).

9.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts and omissions charged herein, including the dissemination of materially false and misleading information to the investing public, and the omission of material information, occurred in substantial part in this Judicial District, as Upstart is headquartered in this District.

10.      In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the U.S. Mail, interstate telephone communications, and the facilities of a national securities exchange.

**DIVISIONAL ASSIGNMENT**

11.      Pursuant to Local Rule 3-2(c) and (d), this action should be assigned to the San Francisco or Oakland Divisions of this Court, as the Company is headquartered in San Mateo County, California.

**PARTIES**

12.      Plaintiff Plymouth County Retirement Association is a public pension system organized for the benefit of current and retired municipal and county employees of Plymouth County, Massachusetts.  Plaintiff manages approximately $1.2 billion in assets.  As set forth in the accompanying certification, incorporated by reference herein, Plaintiff purchased Upstart common stock during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

13.      Defendant Upstart is incorporated under the laws of Delaware with its principal executive offices located in San Mateo, California.  Upstart's common stock trades on the Nasdaq Global Select Market (the "NASDAQ") under the ticker symbol "UPST."

14.      Defendant David J. Girouard ("Girouard") was a co-founder of the Company and has served as Upstart's President, Chief Executive Officer ("CEO"), and Chairperson of the Board of Directors at all relevant times.

15.      Defendant Sanjay Datta ("Datta") has served as Upstart's CFO at all relevant times.

---

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

3

16.     Defendants Girouard and Datta (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

17.     The Company and the Individual Defendants are collectively referred to as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

18.     Headquartered in San Mateo, California, Upstart was founded in 2012 on the premise the Company could disrupt the credit origination process with a smarter credit model that allows lenders to approve more loans with fewer defaults.  The Company went public through an initial public offering on December 16, 2020.

19.     Upstart generates revenue by charging fees, either on a dollar or percentage basis, on loans the Company underwrites.  The Company further charges the banking partners a referral fee each time the Company refers a loan to a given bank and a platform fee each time the banking partner originates a loan using the Upstart platform.

20.     Loans underwritten by Upstart, which the Company refers to as "Upstart powered loans," are funded in one of three ways.  Banking partners will fund loans the banks want to keep on their balance sheet.  For loans that are not retained by banks, Upstart seeks to securitize loans for investment by institutional investors.  When neither the Company's banking partners nor the

institutional investors are willing to fund the loans, Upstart will fund the loans from its own balance sheet.

21.     During the Class Period, Upstart asserted in its filings with the SEC that the Company had little exposure to credit risk from "Upstart-powered loans" because the "percentage of loans funded through our balance sheet has generally decreased, while the percentage of loans purchased by institutional investors has generally increased."

### Defendants' Materially False and Misleading Statements
### Issued During the Class Period

22.     The Class Period begins on March 18, 2021.  After markets closed the prior day, March 17, 2021, Upstart announced its financial results for the fourth quarter and full year of 2020. During the conference call on March 17, 2021, accompanying the release of the financial results, CEO Girouard stated, "Upstart is a fee-based business.  We don't make loans, and *we aren't exposed to material balance sheet risk*."  CFO Datta stated that "in terms of loan assets, we carried an aggregate balance of loans, notes and residuals of $98 million at the end of 2020, down from $266 million at the end of 2019, reflecting the continued reduction of platform loans funded through our own balance sheet."  CFO Datta touted how the amount of loans the Company retained as assets on its balance sheet "represents the totality of direct exposure to credit risk."

23.     During a conference call with analysts on May 11, 2021, which accompanied the Company's release of its financial results for the first quarter of 2021, CEO Girouard explained the Company's rapid growth was "primarily technology and model-driven, which manifests as increasing conversion rates in our borrower funnel."  The Company's "conversion rate" metric is "the number of loans transacted in a period divided by the number of rate inquiries received that [Upstart] estimate[s] to be legitimate."  On the call, CFO Datta noted the Company's "conversion rate of 22% on rate requests, up from 14% over the prior year."  CFO Datta then highlighted that the Company:

> carried an aggregate balance of loans, notes, and residuals of $73.2 million, down from $227.5 million at the end of the same quarter in the prior year. *This reflects the continuing reduction in the percentage of platform loans funded through our own balance*

*sheet*.  It's highlighted during our last earnings call these loan assets represent the totality of the direct exposure to credit risk.

24.     During a June 9, 2021, Bank of America Global Technology Conference, CEO Girouard made the positive comparison of Upstart to a "subprime lender lending off your balance sheet," noting "they are balance sheet lenders which have their own limits."  Girouard then touted that Upstart's revenues are not "anything related to quality of credit performance."  In response to Bank of America analyst Nat Schindler asking how Upstart would "respond to a change in the credit cycle?," Girouard contended "we will handle that recession far better than a traditional system would" and that the Company had "a great proof point that a model like ours actually can handle disruptions in the economy and dislocations better than a standard model."

25.     On August 10, 2021, Upstart issued a press release announcing its financial results for the second quarter of 2021.  During the corresponding call with analysts, CFO Datta reported on the state of the Company's balance sheet, stating, "[i]n terms of loans assets, we carried an aggregate balance of loans, notes, and residuals of $95.3 million, up from $73.2 million in Q1 and down from $148 million at the end of the same quarter in the prior year."  Defendant Datta again explained, "these loan assets represent the totality of the direct exposure we have to credit risk."

26.     On November 9, 2021, Upstart issued a press release announcing its financial results for the third quarter of 2021.  In the corresponding call with analysts, CFO Datta noted an uptick of the "aggregate balance loans, notes and residuals of $140 million," which was "up from $95.3 million in Q3 and down from $145 million at the end of the same quarter in the prior year."  CFO Datta denied that the increase had anything to do with the deteriorating quality of Upstart's loans, and instead claimed that the reason the "dollar volume of loans we carry is edging upwards" was *the Company's "use of our balance sheet to the scaling of our growing auto product, as well as our expansion into lower-credit score segments of personal lending*."

27.     On February 15, 2022, Upstart issued a press release announcing financial results for the fourth quarter and full year of 2021, which ended December 31, 2021.  During the corresponding conference call with analysts that day, CFO Datta assured investors the Company was "cognizant of the fluidity in the macro environment," but that the Company was "not expecting

any meaningful adverse impact from rising defaults on our volumes or economics." Explaining that the Company had "$170 million [that] was reinvested back into our balance sheet in the form of loans made in support of new R&D programs," CFO Datta reported that the "balance of loans, notes and residuals at the end of the year was $261 million, up from $140 million in Q3 and reflecting the accelerated pace of R&D."

28.     The above statements identified in ¶¶ 22 – 27 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants mislead investors and/or failed to disclose that: (1) Upstart's AI underwriting model could not and did not adequately account for macroeconomic factors such as interest rate increases and the end of the U.S. government stimulus; (2) that, as a result, Upstart was experiencing negative impacts on its conversion rate; (3) that, as a result, the Company was reasonably likely to use its balance sheet to fund loans, rendering its balance sheet highly exposed to credit risk; and (4) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.

### The Truth Comes to Light

29.     After the markets closed on May 9, 2022, the Company issued a press release announcing its financial results for the first quarter of 2022, which ended March 31, 2022, and guidance for the second quarter and full-year 2022. The press release included the Company's unaudited Consolidated Balance Sheet for the quarter, which showed the ***loans on the Company's balance sheet had more than doubled in just one quarter***: from $252,477,000 for the period ending to December 31, 2021, to $597,981,000 for the period ended March 31, 2022.

30.     During the conference call accompanying the release of the financial results, CEO Girouard was forced to concede the Company "observed more volatility" for loans funded by institutions and capital markets, which Girouard attributed to "the abrupt termination of [government] stimulus programs [which] caused some of the more recent vintages to underperform."

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

7

31.     During the same call, CFO Datta reported that the Company's "balance of loans, notes, and residuals at the end of the quarter was . . . up to $604 million from $261 million in Q4." Datta further acknowledged the substantial increase to loans maintained on the Company's balance sheet was the result of "loan default rates" from loans from the "two or three vintages" of loans since the expiration of government stimulus.

32.     In response to this disclosure, on the following trading day of May 10, 2022, the price of Upstart shares declined 56%, from a closing price of $77.13 per share on May 9, 2022, to a closing price of $33.61 per share on May 10, 2022.

33.     In a report issued on May 10, 2022, Wedbush analyst David Chiaverini noted that "[w]hile the Company claims that its decision to keep more loans on-balance sheet was used as a market clearing mechanism due to interest rate moves, *we see this as a divergence from its capital-light business model* and could indicate [Upstart] has few alternatives other than to hold more loans due to funding issues."

34.     In a subsequent report on May 13, 2022, Wedbush's Chiaverini highlighted a Kroll Bond Rating Agency ("Kroll") surveillance report on Upstart's securitization trusts and pass-through trust in which Kroll "now expects loss rates to be higher than previously expected for Upstart's pass-through securitizations issued in 2021." Chiaverini further observed that *Upstart began a loan modification program*, which had increased materially in volume between March and April 2022. Commenting on the Kroll Report, Wedbush analyst David Chiaverini noted "Kroll now expects loss rates to be higher than previously expected for Upstart's pass-through trust securitizations issued in 2021."

## CLASS ACTION ALLEGATIONS

35.     Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class, consisting of all persons and entities that purchased Upstart securities between March 18, 2021, and May 9, 2022, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal

representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

36.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Throughout the Class Period, Upstart common stock actively traded on NASDAQ (an open and efficient market) under the symbol "UPST."  Millions of Upstart shares were traded publicly during the Class Period on the NASDAQ.  As of April 29, 2022, the Company had more than 84 million shares outstanding.  Record owners and other members of the Class may be identified from records maintained by Upstart or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions

37.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

38.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests that conflict with those of the Class.

39.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        a.     whether Defendants violated the Exchange Act by the acts and omissions as alleged herein;

        b.     whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

c.      whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, operations, and prospects of Upstart;

d.      whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, operations, and prospects of Upstart;

e.      whether the market price of Upstart securities during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f.      the extent to which the members of the Class have sustained damages and the proper measure of damages.

40.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

**UNDISCLOSED ADVERSE INFORMATION**

41.      The market for Upstart's securities was an open, well-developed, and efficient market at all relevant times.  As a result of the materially false and/or misleading statements and/or omissions particularized in this Complaint, Upstart's securities traded at artificially inflated prices during the Class Period.  Plaintiff and the other members of the Class purchased Upstart's securities relying upon the integrity of the market price of the Company's securities and market information relating to Upstart and have been damaged thereby.

42.      During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Upstart's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or

misleading because they failed to disclose material adverse information and/or misrepresented the truth about Upstart's business, operations, and prospects as alleged herein.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its business, thus causing the Company's securities to be overvalued and artificially inflated or maintained at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class who purchase the Company's securities at artificially inflated prices and were harmed when the truth was revealed.

## SCIENTER ALLEGATIONS

43.    As alleged herein, Defendants acted with scienter in that Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

44.    As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Upstart, their control over, receipt and/or modification of Upstart's allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning Upstart, participated in the fraudulent scheme alleged herein.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

45.    The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when

made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

46.     In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Upstart who knew that the statement was false when made.

## LOSS CAUSATION

47.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, *i.e.*, damages, suffered by Plaintiff and the Class.

48.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions and engaged in a scheme to deceive the market.  This artificially inflated the prices of Upstart's securities and operated as a fraud or deceit on the Class. When Defendants' prior misrepresentations, information alleged to have been concealed, fraudulent conduct, and/or the effect thereof were disclosed to the market, the price of Upstart's stock fell precipitously, as the prior artificial inflation came out of the price.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

49.     The market for Upstart stock was open, well-developed, and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose particularized in this Complaint, Upstart securities traded at artificially inflated and/or maintained prices during the Class Period.  Plaintiff and other members of the Class purchased the Company's securities relying upon the integrity of the market price of Upstart securities and market information relating to Upstart and have been damaged thereby.

50.     At all times relevant, the market for Upstart securities was an efficient market for the following reasons, among others:

a. Upstart was listed and actively traded on NASDAQ, a highly efficient and automated market;

b. As a regulated issuer, Upstart filed periodic public reports with the SEC and/or the NASDAQ;

c. Upstart regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d. Upstart was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

51. As a result of the foregoing, the market for Upstart securities promptly digested current information regarding Upstart from all publicly available sources and reflected such information in Upstart's stock price. Under these circumstances, all purchasers of Upstart stock during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices, and a presumption of reliance applies.

52. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because Class's claims are, in large part, grounded in Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and prospects—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## COUNTS AGAINST DEFENDANTS

### COUNT I
**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants**

53.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

54.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Upstart securities; and (iii) cause Plaintiff and other members of the Class to purchase Upstart stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

55.     Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Upstart securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

56.     Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Upstart's business, operations, and prospects, as specified herein.  Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Upstart's business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts

necessary in order to make the statements made about Upstart and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of conduct of business that operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

57.     Each of the Individual Defendants' primary liability and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period and a member of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's business, operations, and prospects; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

58.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Upstart's operating condition, business practices, and prospects from the investing public and supporting the artificially inflated and/or maintained price of its securities.  As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless

in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

59.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Upstart securities was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants or upon the integrity of the market in which the stock trades, and/or in the absence of material adverse information that was known or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class purchased Upstart securities during the Class Period at artificially inflated prices and were damaged thereby.

60.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the truth regarding the problems that Upstart was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased their Upstart securities, or, if they had purchased such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

61.     By virtue of the foregoing, Upstart and the Individual Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

62.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

### COUNT II
**For Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

63.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

64.     The Individual Defendants acted as controlling persons of Upstart within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operations and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control,  directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  Further, the Individual Defendants signed the Company's 2021 Annual Reports on Form 10-K and the First, Second, and Third Quarterly Reports for 2021 on Form 10-Q.

65.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

66.     As set forth above, Upstart and the Individual Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief and judgment as follows:

a)   Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)   Awarding Plaintiff and the other members of the Class damages in an amount that may be proven at trial, together with interest thereon;

c)   Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d)   Awarding such other relief as this Court deems appropriate.

## JURY DEMAND

67.   Plaintiff demands a trial by jury.

Dated: May 19, 2022                                         Respectfully submitted,

_/s/ David R. Kaplan_
David R. Kaplan

**SAXENA WHITE P.A.**
David R. Kaplan (SBN 230144)
12750 High Bluff Drive, Suite 475
San Diego, CA 92130
Telephone: (858) 997-0860
Facsimile: (858) 369-0096
dkaplan@saxenawhite.com

*Counsel for Plaintiff*
*Plymouth County Retirement Association*

## CERTIFICATION AND AUTHORIZATION

I, David Sullivan, on behalf of the Plymouth County Retirement Association ("Plymouth County"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.    I have reviewed a complaint prepared against Upstart Holdings, Inc. ("Upstart") alleging violations of the federal securities laws, and authorized its filing. I am authorized in my capacity as Executive Director of Plymouth County to initiate litigation and to execute this Certification on behalf Plymouth County.

2.    Plymouth County did not purchase the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

3.    Plymouth County is willing to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4.    Plymouth County's transactions in Upstart securities during the Class Period are set forth below.

| Date | Transaction | Shares | Price |
|----------|-------------|--------|----------|
| 04/01/22 | Purchase | 8,586 | $109.03 |
| 04/19/22 | Purchase | 2,000 | $83.13 |

5.    Plymouth County has sought to serve and was appointed as lead plaintiff and/or representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

> *Plymouth Cty. Ret. Sys. v. Evolent Health, Inc.*, No. 1:19-cv-01031 (E.D. Va.)
>
> *Plymouth Cty. Ret. Ass'n v. ViewRay, Inc.*, No. 1:19-cv-02115 (N.D. Ohio)
>
> *Sheet Metal Workers Local 19 Pension Fund v. ProAssurance Corp.*, No. 2:20-cv-00856 (N.D. Ala.)
>
> *Visser v. Energy Recovery, Inc.*, No. 1:20-cv-05647 (S.D.N.Y.)
>
> *Plymouth Cty. Ret. Ass'n v. Apache Corp.*, No. 4:21-cv-00575 (S.D. Tex.)
>
> *Xu v. Fibrogen, Inc.*, No. 3:21-cv-02623 (N.D. Cal.)
>
> *Plymouth Cty. Ret. Ass'n v. Array Techs., Inc.*, No. 1:21-cv-04390 (S.D.N.Y.)

6. Plymouth County has sought to serve as a lead plaintiff or representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff, was not appointed lead plaintiff, or the lead plaintiff decision is still pending:

> *St. Clair County Emps. Ret. Sys. v. Acadia Healthcare Co., Inc.*, No. 3:18-cv-0988 (M.D. Tenn.)
>
> *Plymouth Cty. Ret. Sys. v. GTT Commc'ns, Inc.*, No. 1:19-cv-0982 (E.D. Va.)
>
> *Koffsmon v. Green Dot Corp.*, No. 2:19-cv-10701 (C.D. Cal.)
>
> *In re AppHarvest Sec. Litig.*, No. 1:21-cv-07985 (S.D.N.Y.)
>
> *Artery v. Astra Space Inc*, No. 1:22-cv-00737 (E.D.N.Y.)

7. Plymouth County will not accept any payment for serving as a representative party on behalf of the Class beyond Plymouth County's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 12 day of May, 2022.

*Plymouth County Retirement Association*

David Sullivan, Executive Director